IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTINE O'KEEFE
*individually and as Administrator of the*
*ESTATE OF CYNTHIA FISCHER, deceased*,

Plaintiff,

v.

RUSTIC RAVINES, LLC, PREMIER
POWERSPORTS RENTAL, LLC,

Defendants.

22cv1178
ELECTRONICALLY FILED

## MEMORANDUM ORDER

Before the Court are Defendants' Motions to Dismiss for Lack of Jurisdiction –

Defendant Rustic Ravines LLC's ("Rustic") motion was filed at ECF 29, and Defendant Premier

Powersports Rental LLC's ("Premier") motion was filed at ECF 31.[1]  Plaintiff filed a singular

brief in opposition to these motions.  ECF 38. Rustic filed a Reply (ECF 39), as did Premier.

ECF 40.  The matter is ripe for adjudication.

## I.      STANDARD OF REVIEW

The instant motions to dismiss, like the previous motions filed in this case, argue that the

Court lacks personal jurisdiction over this matter.  After filing their initial motions to dismiss on

the same basis, this Court denied the Defendants' motions without prejudice to re-raise this issue

following some limited, jurisdictional discovery.  The Court must now re-consider whether

personal jurisdiction has been adequately established by Plaintiff.

---

[1] These are Defendants' second motions. This Court denied their initial motions without prejudice to allow for limited jurisdictional discovery.  ECF 26.

Personal jurisdiction can be general or specific. As noted in this Court's previous Memorandum Order, the issue before the Court then and now, is a question of specific personal jurisdiction.  And to narrow the standard of review scope to its finest point, the issue before the Court is whether Defendants' internet conduct gives rise to specific, personal jurisdiction.

Although repetitive of the Court's prior Order (ECF 26), the following bears repeating prior to conducting the analysis:

In 2021, the United States Supreme Court in *Ford Motor Co. v. Montana Eighth Judicial Court,* 141 S.Ct. 1017, 1024 (2021), held that specific personal jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims."  The Supreme Court, relying on the old "brick and mortar" standards for specific personal jurisdiction, and held that courts should look to the contacts needed for this kind of jurisdiction, which "often go by the name 'purposeful availment.'" *Id.*  The Court defined "purposeful availment" to mean a defendant who takes some act by which it purposefully avails itself of the privilege of conducting activities within the forum State, and then noted that the contacts must be the defendant's own choice and not random, isolated, or fortuitous. *Id.* (citations omitted).  Stated another way, the Supreme Court held that the contacts must show that the defendant deliberately reached out beyond its home – by, for example, exploiting a market in the forum State or entering a contractual relationship centered there.  *Id.*

However, even if the defendant purposefully availed itself of the privilege of conducting activities in the forum state, the Supreme Court held that because the defendant is not at home, the forum State may exercise jurisdiction only if the plaintiff's claims arise out of or relate to the defendant's contacts with the forum State.

Thus, applying these standards to this case, a specific personal jurisdiction analysis requires this Court to consider:

First, whether Defendants in the instant matter purposefully availed themselves of the privilege of conducting activities in Pennsylvania. To this point, the Court must consider whether the contacts were made by each Defendant's own choice (each Defendant's deliberate action) and not by chance -- *i.e.,* not random, isolated, or fortuitous – meaning each Defendant took deliberate action(s), to reach out beyond their home State of West Virginia to connect with Pennsylvania.

Second, these contacts must give rise to – or relate to – Plaintiff's claims.  For the contacts to satisfy the second prong, there must be a strong relationship among Defendants, Pennsylvania, and the litigation.

Finally, the Court's exercise of jurisdiction must be reasonable, so as not to "offend 'traditional notions of fair play and substantial justice.'" See *International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457 (1940)).

## II.    ANALYSIS

### A.    The *Zippo* Analysis

Courts within the Third Circuit rely upon *Zippo Mfg. Co. v. Zippo Dot Com, Inc*., 952 F. Supp. 1119 (W.D. Pa. 1997), when considering whether specific personal jurisdiction should be exercised.  In *Zippo* it was noted:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in

3

foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.*, at 1124.

When in the "middle ground," the United States Court of Appeals for the Third Circuit has held that to determine whether personal jurisdiction exists, courts should examine "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Ackourey v. Sonellas Custom Tailors*, 573 F. App'x 208, 211–12 (3d Cir. 2014), citing, *Zippo, supra.*, and Toys "R" Us, 318 F.3d at 452.  In *Ackourey*, the Court of Appeals found that the website at issue merely listed a travel schedule and only allowed potential customers to email requests for appointments. It did not permit customers to place orders, make payments, or engage in any business transactions. Given these facts, the Court of Appeals held, "This low degree of commercial activity renders Defendants' website essentially passive."  Thus, some interactivity through a website especially that of a non-commercial nature renders a website "essentially passive."

**B. Legal Framework for *Zippo*'s Middle Ground**

Some Federal District Courts in districts outside of the ambit of the Third Circuit have embraced the "sliding scale" approach announced in *Zippo*, while others have criticized and even rejected this approach.  See *ALS Scan, Inc. v. Digital Service Consultants*, 293 F.3d 707 (4th Cir. 2002) (Court of Appeals for Fourth Circuit adopted a three-part test for determining whether personal jurisdiction exists based on internet-based activities derived from the framework first adopted in *Zippo*); *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2021) (At

bottom, *Zippo* seeks to answer the question: Has the defendant targeted the forum state? The touchstone of personal jurisdiction remains the existence of "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *See* Pervasive Software v. Lexware GmbH & Co. KG,, 688 F.3d 214, 222.)). Compare, *Kuan Chen v. United States Sports Acad., Inc*., 956 F.3d 45, 55 (1ˢᵗ Cir. 2020) ("This court has never embraced that [*Zippo*] sliding scale analysis . . . [a]nd where, as here, purposeful availment is plainly lacking . . . the sliding scale adds nothing of consequence to the specific jurisdiction analysis."); *Louis Vuitton Malletier, S.A. v. Mosseri*,736 F.3d 1339, 1355 n.10 ("We recognize the existence of the sliding-scale test for Internet cases first articulated in *Zippo* . . . [b]ut our Court has noted scholarly criticisms of the *Zippo* test. . . . We conclude the traditional, three-prong test works just fine in this Internet case where the website was commercial and fully interactive.").

This Court reviewed the above cited cases and many others decided by several different Courts of Appeal to determine how to best navigate the "middle ground" when applying *Zippo*. Given the Court's extensive research on this topic, and based on the instructive, albeit non-binding case law, this Court finds the following factors to be helpful in developing a way to analyze *Zippo's* "middle ground."

First, this Court adopts the overarching principle as stated by the United States Court of Appeals for the Third Circuit in *Ackourey*:

> This sliding scale ranges from situations where a defendant uses an interactive commercial website to actively transact business with residents of the forum state (personal jurisdiction exists) to situations where a passive website merely provides information that is accessible to users in the forum state (personal jurisdiction does not exist). [*Zippo*, 952 F.Supp. at 1124.] To determine whether personal jurisdiction exists for situations between these extremes, we examine "the level of interactivity and

commercial nature of the exchange of information that occurs on the Web site." *Id.; see* Toys "R" Us, 318 F.3d at 452.

*Id.*, 573 F. App'x 208, 211–12 (3d Cir. 2014) (emphasis added).

Second, given the above, this Court carefully considered how to go about examining: (1) "the level of interactivity[,] and [2 the] commercial nature of the exchange of information that occurs on the Web site." *Id.* The United States Court of Appeals for the Fifth Circuit offered this method in *Johnson*:

> *First*, the defendant must "purposefully avail[ ] itself of the privilege of conducting activities in the forum State." Ford Motor Co. v. Mont. Eighth Jud. Distr. Ct., —— U.S. ——, 141 S. Ct. 1017, 1024, 209 L.Ed.2d 225 (2021) (cleaned up). The defendant's ties to the forum, in other words, must be ties that "the defendant *himself*" purposefully forged. *Second*, the plaintiff's claim "must arise out of or relate to" those purposeful contacts. A defendant may have many meaningful ties to the forum, but if they do not connect to the plaintiff's claim, they cannot sustain our power to hear it. *Third*, exercising our jurisdiction must be "fair and reasonable" to the defendant. Seiferth, 472 F.3d at 271.

*Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th Cir. 2021) (footnotes omitted), *cert. denied*, 214 L. Ed. 2d 277, 143 S. Ct. 485 (2022).

### C. Application of the Legal Framework for *Zippo*'s Middle Ground

Turning to the facts of this case, this Court will first discuss each Defendants' level of interactivity with Pennsylvania – the forum state.

### 1. Defendant Rustic

Defendant Rustic does have a website and its website is more than merely a passive website. This Court defines a passive website as akin to a billboard on the roadside: a passerby may choose to slow down and read it, but even if the passerby slows down to read it or take note of what is on the billboard, that is all that <u>can</u> happen in that moment. There is no way for the

passerby to reach out and touch the billboard to magically connect with the billboard advertiser. Similarly, a passive website is a website that an internet user may pass by or may slow down and read in detail.  But a passive website does not enable the internet user to "reach out" through that website and connect with the website's owner.

In *Ackourey*, the Court of Appeals also held that low-level, non-commercial interactions between an internet user and website owner render the website as "passive," for specific personal jurisdiction consideration.[2]   As stated in *Zippo* and as reiterated in *Johnson,* if the website is deemed to be static or passive, "jurisdiction is unavailable, full stop." *Johnson*, 21 F.4th at 318.

Defendant Rustic's website not only allows its viewers to read all that it has to offer, but Rustic's website enables its viewers/users to rent its cabins, obtain trial permits, and provide payment for the rental(s). By way of example, Rustic's website first allows the user to select the dates he or she would want to stay in a cabin on Defendant Rustic's property.  Next, the website presents to the user what cabins (if any) are available for the dates the user input.  The user then chooses the specific cabin(s) her or she would want to rent, by clicking on that cabin's image. After choosing the cabin(s), the user is prompted by the website to provide payment for the rented cabin(s).

Importantly, Plaintiff's counsel deposed Joseph V. Boffo the owner of Defendant Rustic. According to Boffo's testimony, Defendant Rustic had received a "Tourism Development Act" grant which required at least 25% of Rustic's business to come from outside West Virginia. Therefore, Defendant Rustic knew it had to obtain at least 25% of its business from outside of West Virginia, and thus, it kept a watchful eye for customers who hailed from outside West Virginia .

---

[2] Again, using the billboard analogy, this would be akin to a billboard advertisement containing a QR code, which the passerby could use with a smart phone to "connect with" the advertiser.

In addition, Plaintiff adduced evidence that Boffo kept a system of knowing from where Defendant Rustic's cabin customers originated.  During his deposition, Boffo arrived with a box of thousands of index cards.  Each card provided detailed information about each person (including the person's state of residence), who rented a cabin.  These cards were created if a customer made a reservation with Rustic via Rustic's website (or by walking in, or calling to rental office).  The cards also indicated who purchased a trail permit for the Hatfield-McCoy Trails (which were located close to the cabin site) through Rustic.

Next, Plaintiff's counsel demonstrated through Boffo's deposition testimony that Defendant Rustic's website specifically contained directions to Defendant's "brick-and-mortar" location from various other states, including directions from Pittsburgh, Pennsylvania.[3]  Boffo testified that the reason Pittsburgh was listed on the "how to get here" webpage as the second out-of-state city was because of its size.  In addition, he said he did not believe that there were many index cards showing cabin rentals and/or trail permits to Pennsylvania residents.

Although Boffo testified at one point during his deposition that he thought Rustic's cabin rentals and trail pass puchases to Pennsylvania residents were 1% or less of its total business, Boffo, when presented with data, later admitted that 13% of Defendant Rustic's income in 2021 came from the sale of trail permits to Pennsylvania residents.  Boffo also admitted that almost 20% of Defendant Rustic's 2022 income came from the sale of trail permits to Pennsylvania residents.

---

[3] In the "how to get here" section of Defendant Rustic's website, there are directions to Rustic's campsite from the following locations in the order which they appear on the website: (1) Huntington, West Virginia; (2) Charleston West Virginia; (3) Columbus, Ohio; (4) Pittsburgh, Pennsylvania; (5) Cincinnati, Ohio; (6) Lexington Kentucky; and (7) Louisville, Kentucky. *See* https://affordablewestvirginiacabinrentals.com/about/how-to-get-here, last visited 3/22/2023.

Given the above facts adduced during the discovery period, the Court finds that when taken as whole, all of these facts support a finding that Defendant Rustic purposefully availed itself of conducting business in the Commonwealth of Pennsylvania. This evidence, taken as a whole, demonstrates how Defendant Rustic's ties to Pennsylvania were ties that Defendant itself purposefully forged. Although Boffo attempted to claim he did not know that a sizable portion of his trail permit business was emanating from Pennsylvania,[4] this Court finds that Defendant knew it had to obtain at least 25% of its business from outside the state of West Virginia.

Further, the Court finds that Defendant Rustic included directions on its website from nearby cities located in other states, namely Ohio, Pennsylvania, and Kentucky for the express purpose of attracting customers from those locations. Given the data that Plaintiff was able to adduce during Boffo's deposition, Defendant Rustic chose to list Pittsburgh as the second out-of-state city for a reason – it is much further from the camp site than Cincinatti, Lexington, and Louisville, and it is smaller in population density than Cincinatti, Lexington, and Louisville. The Court therefore concludes that Rustic purposefully availed itself of the privilege of conducting business in Pennsylvania.

Because this Court concludes that Defendant Rustic purposefully forged ties with Pennsylvania, the Court next considers whether Plaintiff's claim arises out of or relates to those purposeful contacts. The simple and short answer here, is "yes." Plaintiff is the decedent's mother who brought negligence claims (among others) on her own behalf and on behalf of the estate of her decedent-daughter, who was a Pennsylvania resident, and who allegedly was

---

[4] Counsel for Plaintiff was not presented with the index cards prior to the deposition and thus, he could not determine during the deposition what percentage of Rustic's cabin-rental business emanated from Pennsylvania in 2021 and 2022. Counsel was, however, able discern the percentage of Rustic's trail permit business because he had previously been given copies of the trail permit contracts for 2021 and 2022 which contained the trail permit purchaser's state of residence.

Defendant Rustic's customer at the time of her death while riding a rented ATV on the Hatfield-McCoy Trails. Record evidence shows that Defendant Rustic provided decedent with access to Defendant Premier's ATV and sold her the Hatfield-McCoy Trail permit.

Finally, this Court finds that its exercise of jurisdiction over the claims against Defendant Rustic are fair and reasonable to Defendant Rustic again, based on the sum total of the evidence produced to date as described above.

### 2. Defendant Premier

Defendant Premier's website provides far less information than Defendant Rustic's website in terms of targeting Pennsylvania residents. William Ossie Lucas, owner of Defendant Premier, testified that Defendant Premier "advertised" itself on Google and operated a business account through Facebook – meaning that Defendant Premier had its own Facebook page. Lucas admitted that he created the Facebook page for Defendant Premier and followed prompts on Googles website to advertising his company through Google. He further testified that he hoped Premier's Facebook page and Google advertising mechanisms would cause Premier to obtain more customers. Lucas also testified that he entered into an agreement on behalf of Defendant Premier with Defendant Rustic in an attempt to get additional ATV business through Rustic's cabin renters and trail permit purchasers.

However, no evidence was adduced to show that either of Defendant Premier's website, Google advertising or Facebook platforms enabled interested individuals to do more than view what Defendant Premier had to offer. Neither site offered a click-through method of contracting with Defendant Premier. In addition, no evidence was adduced to demonstrate that Defendant Premier was aware that Rustic obtained a sizeable portion of its cabin rental and permit purchasing business from Pennsylvania residents in 2021 and 2022.

Plaintiff's counsel, through Lucas, was able to produce Google analytical documentation which showed that 60% of Defendant Premier's customers came from outside its "immediate area" and Lucas willingly admitted that he would rent to anyone from Pittsburgh, Pennsylvania. However, neither of these pieces of evidence illustrate how Defendant Premier's ties to the Pennsylvania were ties that Defendant Premier itself purposefully forged.

Lucas testified that he never even bothered to track where Defendant Premier's ATV and equipment renters hailed from.  Simply put – Defendant Premier would rent its ATVs to anyone, but does not appear to have deliberately targeted Pennsylvania residents for this purpose.  At least no evidence was adduced by Plaintiff during the discovery period.  Accordingly, because Plaintiff proffered no evidence whatsoever illustrating how Defendant Premier purposefully availed itself of the privilege of conducting business in Pennsylvania, this Court finds that it does not have jurisdiction over Defendant Premier.

## III. CONCLUSION

Based on the foregoing, the Court will deny Defendant Rustic's Motion to Dismiss, but will grant Defendant Premier's Motion to Dismiss.

**ORDER**

AND NOW this 22nd day of March, 2023, Defendant Rustic Ravines LLC's Motion to

Dismiss for Lack of Jurisdiction (ECF 29) is hereby DENIED, but Defendant Premier

Powersports Rental LLC's  Motion to Dismiss for Lack of Jurisdiction (ECF 31)is GRANTED.

No further jurisdictional discovery shall be permitted.


       SO ORDERED, this 22nd day of March, 2023.

       s/ Arthur J. Schwab_____
       Arthur J. Schwab
       United States District Court Judge

cc:  All ECF Counsel of Record